I'm Tim Coffield and I represent the appellant, Gordon Goines. Also with me today is Jesse Baker, representing Mr. Goines. Gordon Goines walked into the Waynesboro Police Department and reported a crime. He told the officers there that when he turned on his television, the television would freeze and it would produce strange noises, unwanted interference. He told the police officers that he had contacted Comcast, his service provider, about these issues. And Comcast had determined that someone in his apartment complex had spliced the cable running to his apartment. In other words, someone in his complex was stealing cable. Mr. Goines explained this to the police officers. He also explained to them that he would not have felt comfortable confronting any of his neighbors about this possible crime himself, not knowing how they might react. He clearly expressed absolutely no intention or desire whatsoever to have any confrontation with any neighbor. He even told the police officers, I don't want to get in a fight with anyone. Instead of investigating his complaint, the officers concluded Goines had mental health issues. Well, didn't they go to his apartment? After he came to the police station, then they went to his apartment. And he talked about hearing noises and they didn't hear him. And it sounds to me like there was a lot of miscommunication or misunderstanding. But I'm not sure the way you presented the facts is the way the officers perceived the facts based on what was being said. I would agree that the way I presented the facts is not the way the officers presented the facts in their police report. And I agree with you that they did. But there's no reason for them to lie in the police report. The police report, the guy behind the desk sensed there was some kind of problem. And he said there may be a mental issue here based on the things that were said to him. So two other officers decided to go with the man to his apartment to see what the problem was. But that didn't solve that. It actually confounded it even more based on what they perceived and what was being said. You know, when I got done reading the facts in this case, this may not be the right allegory, but I thought of this as a Greek tragedy because there's nothing wrong that your man did. Your man is benign. He's faultless. He did what he thought was appropriate. The police didn't seem to have done anything wrong either. They were benign. They were trying to handle it sensitively. They played it out and went step by step as the protocol was. It turned out they didn't know his story, and he didn't communicate it well to them. But here you have two faultless people coming together having this conflict. Isn't that what Oedipus was all about? He killed his father and didn't even know it. It's one of those things where there's a lack of knowledge caused the harm, not any one of the people. And I think it would be good to take on the facts that the officers related as to how they understood them as they were being told to them and see whether they mishandled them at that point. I agree with you, Your Honor, that what happened here was tragic, but I respectfully disagree with the suggestion that the police officers did nothing wrong. They did accompany Mr. Goins to his apartment. The problem is they did nothing to investigate what he had told them was happening to his cable. Their interaction was very brief. They were only in his apartment for a few minutes. What did he say to the two officers in the apartment, exact words as best you can recall? He said, they're stealing my television, didn't you? He did make that statement. He said it at the police station. He also said it again when they were in his apartment. He told them, they were stealing my television. The police officer actually repeated that back to him, so it's clear they understood that much of his complaint. So then they get there and they see the television, and then he says, it's making noises. Now, he didn't say, when I turn it on and try to get a signal, it makes noises. He said, it's making noises, and the officers say, I don't hear any noises. We don't hear any noises. So that miscommunication, the officers weren't being mean or benign or mean-spirited to him. They were trying to understand, but what he's saying is getting them in a little deeper already. I mean, it would have been easy to solve this, you know, if Comcast had written out a little ticket and say, it looks like your signal's been spliced into, and you have to take this up with authorities and sign it. He could take it over, but he didn't have that. They didn't understand that his cable line had been spliced into. He talked about his television being stolen. He told them that his cable was being stolen. He told them why he believed that, and he told them what his neighbor's actions were causing his television to do. At no point did Mr. Goines tell police officers that he was hearing noises that the police officers could not hear. He told them at the police station before they went over to his apartment that, because someone has interfered with the cable running in my apartment, when I turn it on, it makes noises and the television freezes. That's what he told them. That's what we allege in the complaint. They say that he used the words that my neighbors are controlling my television. That's how the police officers characterized his complaint in their statement. They don't quote him directly, but that was how Officer Shaw summarized his complaint. I don't think it certainly does not accurately capture what Goines told them or what they knew, the full extent of what they knew about his complaint. There's a question here about whether he conveyed a threat. When he said, I don't want to kill my neighbors. I just want to punch them out or something, just hurt them, I guess. Goines, in his complaint, doesn't deny making those statements. The district court said in the footnote he denies that they were a threat. Now, was it reasonable for the officers, when somebody says, I don't want to kill them, but just hurt them or punch them out or something, even if he's talking hypothetically, would it be unreasonable for an officer to interpret that as a possible threat? Two points, Your Honor. First of all, if Goines had said to a police officer, I don't want to kill them, I just want to hurt them, that's a completely different set of facts that are not before the court and they're counter to what actually happened here. We allege in the complaint that in no time did he threaten to harm anyone. What actually happened is this. As I mentioned before, he walked into the police department, explained the situation in his cable, told the police officers he had no desire whatsoever to confront a neighbor because he was afraid of how the neighbor might react. And in that context, he said, I don't want to get in a fight. This is such a mundane statement to make. To read a threat into that is just not reasonable. What the officers did is they seized on that, and a little bit later one of them asked him, so if you did get in a fight, what would you use to hurt someone? That language came from the police officers. That did not come from Mr. Goines, Your Honor. Let me ask you this. This is before the court on a 12B6 motion. Yes, Your Honor. So you're looking at the complaint to determine whether or not it sufficiently alleges a cause of action. Now, on one of these points, he says on paragraph 34, in no time did Goines make any threat to do any harm to any person or to himself. So would we take that as true for the purposes of a 12B6 motion? It must be taken as true for the purposes of a motion. Now, what if it's contradicted by evidence in the incident report that's not attached to the complaint? Which prevails for purposes of the 12B6 motion, the allegation in the complaint or something contrary in the incident report? The allegation in the complaint has to prevail. All right. Now, isn't a requirement for taking a person into custody for mental health issues or mental illness that they be a danger to themselves or others? Yes, Your Honor. And haven't you alleged that he wasn't a danger to himself or others? Yes, we've alleged that. Isn't that taken as true for a 12B6 motion? Yes, Your Honor. Thank you. Let me ask you about the procedural aspect. I sort of have assumed that the incident report, the preliminary screening report, the petition, and the order were all explicitly referred to and quoted or attached to the complaint. Is that wrong? That is not wrong. The temporary detention order and the report prepared by the mental health evaluator were attached to the complaint. The police report was quoted in context in a couple of paragraphs in the complaint, both of which. I'm just trying to say I understand that. I agree. I've gone through and carefully read it, and it seemed to me that under the normal rules all four of those documents are part of the complaint when evaluating the complaint. We have no objection whatsoever to the district court. This is just a procedural. It's a 12B6 question. What is the complaint? I'm assuming, and I may be wrong, and that's why I'm asking you this, but I'm assuming that those four documents are part of the complaint. They're part of the complaint for the purpose for which they are alleged in the complaint. I'm asking you if the whole document is part of the complaint. If the incident report is quoted, does the whole incident report become part of the complaint? Unless I'm mischaracterizing your question. With the incident report, we can stay with that. A couple were attached, but the incident report was actually quoted and referred to as if the incident report was acceptable. You're alleging it. And, of course, the incident report is part of the response, and you've quoted it. My question is on a 12B6, in this type of circumstance, is that to be taken as part of the complaint, the incident report? Yes, it was part of the complaint because it was a written instrument that we attached to the pleading. However, in evaluating that pleading for the purposes of a 12B6, the statements made by the defendants in that attachment should not be taken as true. The only facts that are – That's another issue. I'd like to stay with the complaint first, what's in the complaint. So you agree with the incident report. How about the prescreening report? I agree about the prescreening report, which was attached to the complaint. 24 pages, right? It's a long document. And the petition for order was either attached or directly referred to, right? Yes, the order was attached to the complaint. No, the petition. The petition was also attached to the complaint. Those were the two attached. And the order was. Yes, Your Honor. All right, so now we get to the question you want to argue. That is, when you have these four documents in there that relate a scenario fairly consistently, relate a story from the officer's point of view, the health care provider's point of view, the guy behind this point of view, and the magistrate judge's point of view, when you have that story and put it with the complaint, don't you have to read the complaint in light of those things? You can't attach it and say something else, can you? You can't say the report is something else other than what it is. There is no case that I can find, no case that the district court cited, that held that the complaint must be read in light of the factual allegations and documents and references. But if you make the allegations, when you attach a contract to a breach of contract case and you have the language of the contract there, the court's allowed to look at the contract. Absolutely, and we have no problem with the court looking at the screening report we attached to the complaint. Our issue is that the court should not have taken statements that the defendants made in that report and taken those statements as true. Did you object to the inclusion of the incident report as part of the materials the district court could review in making the 12B6 motion or did you object up here to the fact that the incident report was part of the record on the 12B6? We don't object to the court considering the document. What we object to is the court taking statements in that document as true when those statements were not alleged in the complaint. Or conflict with statements made in the complaint. For example, Your Honor, with respect to the incident report, it wasn't an attachment, but we allege at a couple places in the complaint that according to this incident report prepared by Shaw, Goins said that a neighbor was controlling his television. That's in the complaint to contrast what actually happened with how the officers chose to portray that interaction after they had unlawfully seized him. Let me ask you this. I'm out of time, Your Honor. You can answer Judge Wilkinson's question. If we were to remand this for further proceedings, that wouldn't mean it would go to trial necessarily, but it might contemplate some discovery, which you really haven't had yet, have you? We've had limited third-party discovery, but none of that was on the table. None of the discovery we would have presented was on the table at the motion to dismiss stage. So what would you hope to learn from deposition testimony and discovery that you don't know now? I mean, how would discovery be fruitful to you in this case? Three points, Your Honor. One, I would like to speak with the police officers to nail down exactly what was said between them and Gordon Goins prior to the portion of this entire interaction that was videotaped, which we obtained through discovery, which has not been before the court yet. Second, I would like to depose Ms. Rhodes, the mental health evaluator, to understand what the police officers told her about Mr. Goins and the threats that he did not make. It seemed to me your case against Ms. Rhodes was much weaker. She didn't misrepresent anything to the magistrate who issued the commitment order, and she simply relayed what the police officers told her. There's no indication that she falsified anything. There's no indication that she did anything outside the confines of Virginia laws. So I'm interested in what would you want to know, what would you hope to learn from discovery from the police officers, not from Ms. Rhodes? I think the case is weaker against her. But what would you hope to learn from the police officers if you sent this back to discovery? I would want to establish what they actually knew about Mr. Goins' complaint at the time they decided to take him in. Let me ask you, I'm looking at this. The incident report is fairly detailed, and you allege in paragraph 26, Sean Dean followed Goins to his apartment. Sean Dean apparently ignored or did not take the time to understand Goins' complaint. According to the incident report later prepared by Sean, Goins told them there was a clicking noise in the wall because someone outside was controlling his TV. Sean Dean did not hear the line noise and signals because they did not turn on Goins' television. Now, it seems to me you're not denying what was in the incident report. You're explaining that the noise in the complaint, you're saying that they wouldn't, I guess, wouldn't hear the clicking noise unless they turned the television on. Mr. Chief Judge, may I answer this question? Absolutely. Your Honor, the purpose of that allegation, the paragraph that you just read, was to contrast how Officer Shaw chose to portray the interaction in the incident report. You don't say it wasn't true. What you say, there's an explanation for it. But you don't say what he said wasn't true. And that's pretty important, especially when you're talking about qualified immunity or damages, because the question is what are these officers thinking? Are they clearly violating constitutional law when they thought this guy was reporting things? They didn't understand the story, according to what you're alleging. The reason is they didn't turn the television on. That's the explanation. But the report is accurately quoted here, and it's in the record, and it doesn't look to me like you're contradicting it. It looks to me like you're just explaining it. But what you're doing is putting two sides of the story together. You're saying he had these disabilities, he was explaining this, he had to have the television on, he had the Comcast guy. Of course, none of that, the officers knew the Comcast guy. They didn't talk about that. They said a neighbor's stealing a television. And I don't see, tell me if you said that's untrue. I think your complaint really just explains the other side of the story from Goins' point of view. I think the question of what the police officers understood from their interaction with Goins is a question of fact that needs to be resolved after some discussion. You're alleging what they saw. They said what they saw. They accept it, and you accept it. What you're saying is what they saw wasn't true because they didn't turn on the television. Now, when you analyze that type of a complaint, you're not saying they lied when they reported that. What you're saying is they didn't understand the full story because the clicking doesn't come on until you turn on the television. You're reporting all the facts from Goins' point of view, which is fair enough, but I'm still going to the question of whether we need anything more because it looks to me like the officer's story is not challenged in the complaint except they didn't know the explanation. But what they said and what they saw is not challenged. And what Goins said and what he saw, his explanations are not challenged. This gets me to my very first question is here you have two innocent people not communicating, but when we analyze a complaint from the officer's point of view, how can they be liable under the law based on what they heard? Thank you, Your Honor. Our position is this should go back so we can determine what the officers actually knew at the time of the seizure. Thank you. Mr. Baker? Excuse me. I'm sorry. I went out of order. Mr. Milner? Good afternoon. My name is Richard Milner, Charlottesville, Virginia, Zonka Milner Carter. I represent officers Robert Dean, David Shaw, and C.L. Williams, all Waynesboro City police officers. At the outset, in response to some of the questions that were asked to Mr. Coffield about this incident report that was quoted repeatedly, I think eight paragraphs I put in our brief, and albeit selectively. Well, your brief is not completing. Under 12B-6, we're challenging the sufficiency of the complaint and addressing, if we can, qualified immunity. And the question is whether the complaint forestalls the court's finding or indicates that qualified immunity can't be ruled on at this point. We submit that Judge Dillon got it right and that it could be ruled on and was correctly ruled on at this point with respect to all three officers. With respect to Officer Williams, reviewing the complaint only reflects approximately two allegations against him. We also filed a motion to dismiss as to him. And on page 16, footnote 8, Judge Dillon dealt with Officer Williams and found that as to him, that he was the beneficiary of the court's analysis, both with regard to Shaw and Dean finding qualified immunity under the second prong of the qualified immunity analysis, the court using its discretion to proceed to that prong, which it found dispositive as to Dean and Shaw, but also said that Williams was entitled to the benefit of the court's analysis and finding of probable cause with respect to Rhodes prior to the TDO and its analysis as to Rhodes. In other words, that Williams had probable cause. The point is that as to Williams, Williams is not addressed in the plaintiff's brief. Don't focus on the brief. It's got to be the complaint. We submit. What does the complaint say about Williams? Little. It says he was a police officer. And I believe it says then correctly that he executed the TDO issued by the magistrate on Mr. Goins. And that's it? And we argued below that that's it. Is that all that's alleged? Basically, it's my recollection that's all that's alleged. But in any event, they've waived and abandoned any claim as to Williams under Injun versus Roche Diagnostics, 335F303 we submit because, as we pointed out in our brief, we replied to their brief only as to Dean and Shaw because they didn't say anything. They've said nothing in their briefs about anything wrong that Williams did. It doesn't help us to talk about who included what in his brief. What it helps us is to decide whether the complaint is sufficient. 12B6. 12B6, we submit that the complaint with the incident report, which was argued and apparently the plaintiff agrees, integral to the complaint was repeatedly quoted in the complaint with quotation marks. He agrees with you. He agrees that it can be taken as part of the complaint. His argument, if I understand it, is he was using the incident report to report what the officers said, but he is providing a different explanation in the complaint. That being said, and, of course, he admitted. Is that what you heard? That's what I heard him say. But what that goes to is qualified immunity. And as the court noted, it appears that you have these two people, or actually Mr. Goins, and then he goes in and sees Officer Feazell and reports what he reports to them. And then in the complaint he says that Officer Feazell then talks to Dean and Shaw and says, hey, this fellow seems to be having some mental issues with his TV. He puts that in the complaint. And he does leave out the part about where Feazell also told Dean and Shaw that the fellow said he was going to hurt somebody. And so we've got that in the complaint that he's been told, Dean and Shaw, that the officer feels who they can rely on, that he has mental issues. And then we have going down to the complaint. You mean it's in the complaint by virtue of its inclusion in the incident report? No, in the complaint. That he's going to hurt somebody? Well, the hurt somebody is not specifically in the complaint. Yes, it is. It's denied in paragraph 34. At no time did Goins ever make any threat to do harm to any person or to himself. Yes. Our position is that the allegation in paragraph 34 of the complaint does not insulate the complaint on Rule 12b-6, where this court can take into consideration the allegations or the statements in the incident report, including, for the purposes of qualified immunity and the second prong, that Officer Feazell in the first... Are you saying the incident report trumps the specific allegation of the complaint? No. Where they directly contradict each other? If it were an exhibit, I would say for all purposes under Rule 10c, it can be used, and that the general rule in the Fourth Circuit is that if there's a contradiction between the exhibit and the allegations in the complaint, the exhibit controls. Now, what Judge Dillon did here is said... What did the district court say about that? District court said, what we're going to do is look at the Sixth Circuit, the so-called Jones exception, and look at it this way. Well, I'm reading the incident report on page 175... I mean, not the incident report, but her order that says, the incident report, which the court credits as accurate insofar as it does not conflict with the allegations in the complaint, describes someone so. Yes, sir. And that is actually what... That's the summary of her ruling as to the Jones exception adopted... Do you think she's wrong about the law on that regard? No. I think that unless the court, this court... Well, she noted and the district courts have noted that the plaintiff cited in the Moody case and the other Pinder case, I believe, that the district court judge says the Fourth Circuit, this court, has not yet adopted the so-called Jones exception from Jones v. City of Cincinnati in the Sixth Circuit. Judge Dillon went out of her way and said, so my task is to try and figure out what I'm going to do with this incident report and the allegations in the incident report that are inconsistent or denied by or refuted by allegations in the complaint. And she said, as to those, I'm going to be bound by what's in the complaint. But as to those that are not denied in the complaint, since he selectively quotes it and has agreed it can be used, and are not denied, those can be considered. And one of the most important ones we submit is this incident report in the first paragraph, which is quoted in the complaint, said that Officer Feazell had advised that he seemed to be having some mental issues going on over an issue with the television. Let me make sure I understand your position. You're saying that if a complainant refers to an incident report and quotes parts of it, that he then has a responsibility to avoid a successful 12B6 motion, to go through and specifically deny the parts of the incident report that he doesn't agree with and doesn't believe are true? I think, is that the responsibility we're going to put on a plaintiff, filing a complaint? I think when you start quoting incident reports, eight specific sections, as Judge Spencer said in Gassner, and this Court has previously ruled, I think when you attach a court can consider, in its de novo review of a 12B6 ruling, items that are integral to a complaint and authentic, and there's been no challenge to the authenticity. And what could be more integral to this complaint? I know, I wasn't answering my question, yes or no. That seems to me a simple question. Do you have to deny all of the allegations of an incident report with which you disagree? Yes. Yes, if you're going to quote it. Okay, thank you. You can choose not to quote it. Thank you. Thank you very much. Mr. Bowling? Let me just ask you before you sit down. You don't represent Fizel, do you? Excuse me? You don't represent Fizel, Officer Fizel? No, he's not a defendant. Oh, okay. Well, this complaint says that Goins explained to Fizel that he did not feel comfortable confronting his neighbor about the cable theft because he did not know how the neighbor would react. Goins told Fizel he did not want to get in a fight with the neighbor. Yes, sir. Is that an impression? Could an officer take that as a threat? Yes, sir. And it's expanded upon later in something that was admitted to that is in the complaint. I just read from you. That was the complaint? Yes. He's talking about a fight with the neighbors. He said he didn't want to get into a fight. He didn't want to. That's why he was coming to the police station to report hearing these noises in the wall because somebody was controlling his TV. Thank you, Mr. Milner. Thank you. Mr. Bowling? Who do you represent, Mr. Bowling? Good afternoon, Your Honor. My name is Jim Bowling. I represent Jenna Rhodes, the certified prescreener in this case. Your Honor, Ms. Rhodes' position is that she, for purposes of my argument today, is that she particularized the factual basis to her findings of mental illness and recommendation that a temporary detention order should be issued. And she included statements made by the plaintiff, either by the plaintiff himself to her or as related by the police officers who were also present during her interview. We submit that as a result her prescreening actions were objectively The officers conveyed to Rhodes that Goins had made threats against a neighbor? Yes, they did. And I think that's reflected in her prescreening assessment in the appendix, Your Honor. Okay. And your view is that she was entitled to take those complaints as part of her judgment. She is. If it's a trustworthy And in addition, she interviewed Goins herself. She did, Your Honor. And so your view is that she was able to take the complaints that were relayed or the information that was relayed to her by the officers, including the fact that Goins had made a threat, and add to those her own impressions, which had to do with just a complete unresponsiveness or complete inappropriate responsiveness in terms of the questions that she was asking. There was a considerable degree of disorientation. Exactly, Your Honor. And there's no contention made here that Rhodes misrepresented anything or falsified anything or that she didn't She presented a set of facts to a magistrate, which is what she was supposed to do. By statute, Your Honor, yes. By statute, was to present those facts to a magistrate. And you have a situation here that's like Leon. You know, we want to put things into legal channels. We want police office to get warrants. We want social service workers and community board workers to interview, screen, and submit impressions and facts to magistrates. And your view is that she behaved and conducted herself within the law at all times. Exactly, Your Honor. She had a more nebulous task than, for example, a police officer who's petitioning a magistrate to get a search warrant. And the reason for that, Your Honor, I believe, and as the court has recognized, and I cannot remember whether it was this court in Rob or the court below in Rob with Judge Hudson, it's a more nebulous area because a search warrant, you're talking about things that have actually happened, while the certified prescreener has the obligation by statute to determine whether the individual that is before her poses a threat in the future to himself or others, which is a much harder task, Your Honor, fact-wise. And she had the, whatever one can say about the report, she had the information. She did, Your Honor. From the offices as to the fact that he thought neighbors were controlling the television and that he, in the officer's view, had made threats against the neighbors. Whether they were true or not, that was the information that was relayed to her. That's correct. And whether they were true or not, Your Honor, is not the issue. No, it's what she learned from a reputable source. But she added to that her own impressions and the disorientation that was apparently exhibited. And then she followed Virginia law. And she didn't go off on some path of her own. She presented the facts in a report to the magistrate. I don't understand exactly what else she should have done. Well, we concur with that, Your Honor. She really, the facts, if you read her assessment in her pre-admission screening report, I think it's page 23 of the Joint Appendix, you'll see that, 22 of the Joint Appendix, you'll see that her reasons are not just, she doesn't just lay out things that support her findings. She lays out what the plaintiff denies, that he's mentally ill, that he's in perfect health. So the magistrate could have a full story. So the magistrate could have a full story. Now, if this pre-screening assessment had not been attached to the complaint, I submit to you that we wouldn't be here supporting Judge Dillon in this case. But because it is attached, then the position that we've set forth would be followed by this court, either finding that probable cause was met or certainly that qualified immunity is justified in this case, which you can do because you've had now, you've had. And the Supreme Court's engaging in a number of summary reversals of circuit courts for denying qualified immunity in close cases. And if there's any area that calls out for being aware of the nebulous nature of the determination of mental illness, of an imminent threat to herself and others. Determining whether somebody is mentally ill is a very subjective, judgmental thing. You've got a hard line to walk. I don't understand why she was included as a defendant in the case. It seems to me that she just did what she should have done. She made a recommendation. It's a thorough report. She laid out the case. She interviewed him. And you also have to consider the statutory framework for deciding to commit a person against his will. This is the first step of due process with the police officers interaction. The second step was Ms. Rhodes' evaluation. The third step is the magistrate finding probable cause. I've run out of time, Your Honor. You want to answer Judge Wilkinson's question? The fourth question is, the fourth step was then she has a hearing before the general district court judge. And then you've also, so there's plenty of opportunities for due process all down the line in this important area for both the individual and for society. Thank you. Thank you. Professor? Good afternoon. I am Rosalie Fessier. I'm here representing Valley Community Services Board. The claim on appeal against Valley Community Services Board is whether there is municipal liability for the actions of Jenna Rhodes, who was their subordinate employee. She was the designee of the Community Services Board, who was certified by the state to provide this initial evaluation of an individual brought for a TDO for temporary detention. But if she did nothing wrong, there's no liability on the part of the board. That is correct. The first threshold issue the plaintiff has to meet in order to impose liability on the Community Services Board is that their subordinate committed a constitutional violation. Even then, you'd have to follow that there was some pattern or that some policy was followed that was the cause of it all. Again, there are multiple hurdles to finding both Ms. Rhodes and the Community Board liable. That's correct, Your Honor. Even if the court were to find that Jenna Rhodes committed a constitutional violation, plaintiff has to show that there was some customer policy on the part of the Community Services Board that was the driving force and the motivating factor in the constitutional violation. The only thing that they have pointed out in their arguments, and it's not at all clear in the complaint, but what they have argued is that it was a failure to train because she lacked a license to diagnose. There is one piece of a 12-page prescreening report that contains a diagnosis, a DSM-IV diagnosis. Their entire case against Valley Community Services Board is that she doesn't have a medical license, which allows her to make a diagnosis. Therefore, she's not trained. They point to no pattern or list of prior incidents where there was constitutional violations committed. The statutory framework requires the State certifies her. The State of Virginia believes she is qualified. There is no challenge to the fact she was a certified prescreener under the statutory framework. Section 37.2801 further requires the State to provide the forms, the prescreen admission forms that Jenny Rhodes used here, which has the section on diagnosis. So the State of Virginia requires their certified prescreeners. It doesn't require a license, but in this limited context, the State of Virginia has authorized them to use these forms, and they must use these forms, which includes a very small section which has a diagnosis in there. There is nothing here that is so patently obvious to Valley Community Services Board that would put them on notice that they are deliberately indifferent to Mr. Gowen's constitutional rights. And for this reason, the plaintiff has not established or not stated a claim in the complaint against Valley Community Services Board. Thank you. Mr. Baker. May it please the Court. Just to address, I guess, some of the concerns that the Court mentioned, as to whether we believe it is objectively unreasonable for the officers to conclude from Gowen's statement that he did not want to get into a fight, the exact opposite. They did, in fact, want to get into a fight. And the other conduct by the officers that we didn't think supported a finding of probable cause was in asking the way that they asked the questions of him, if he were going to get into a fight, what he would use. We just can't really think of an answer that could have... What the officer said also is that he said he was going to get to the point where he's going to take it into his own hands. And that's not... I know that there's an issue about what should the statements from the incident report should be. Let me just deal with a couple of formal matters. What's your complaint against Williams? At the time, from the information that we knew, as far as we knew, Williams was the one who transported him. We don't necessarily have as much information about that. You don't have anything, do you? I'd say that we really don't know beyond... What did he do wrong? He was included at the time because we didn't really have a clear picture of who transported Goins and when. So Williams just transported him, that's it? Actually, we don't even think at this point that it was Williams that transported him. What's the problem you have with Rhodes? With Rhodes, we do think that there was an additional investigation that she should have and could have conducted. We would contrast it against some of the other mental health screening cases. In Rob Campbell, in that case, he contacted the family of Rob. He had e-mails from the officers where Rob talks about specific threats. No, but look what she's working with. She's working with... She said, talk about neighbors controlling his television. Client made threats that he was going to assault his neighbors with my hands and then later referred to taking care of it myself with his Smith & Wesson firearm. Now, this is what she is acting on. And the question is, if that were true, just hypothetically now, if that were true and she didn't take some action and somebody got hurt, it would be a terrible mistake on her part not to take some action. And our contention is that all those statements were from the officers. I understand, but she can't... An officer reports something to her. Is she going to call the officer a liar? No, but we do believe she could have asked the questions of Goins. As far as we can tell from her screening report, she didn't ask any of those questions directly of Goins. She didn't contact... Even though there's a checkbox... Where do you see that? It's just in the way that... I don't... But in the way that the first few lines it says, reportedly Goins said, reportedly, as far as we can tell from the report, it appears these statements were communicated from the officer. Let me ask you, if she... If all this is information that was told to her, did she do anything wrong? If it was information that was told to her from Goins? From police officers. From the officers. Again, we do think that, considering the other cases like Kloinger and Rob, that they did more to investigate independently. They took some of the statements from the other individuals, but they looked into it. She didn't contact his primary physician. I understand that, but she's at a stage... She's making a judgment, an assessment. She's talking to him. She's seeing him. She's seeing reactions physically. He's not reacting, various things. And then she's got this information that he's prepared to use a Smith & Wesson. And our contention is to those physical reactions, many of them were manifestations of his physiological disease. And, I mean, she also did not confirm that he had this physiological disorder. She should have contacted or could have contacted his primary care physician. I understand it's a high standard, but considering that this is... It's not a high standard. The question is, a doctor is told some facts by a police officer, and the facts are that this person has threatened somebody, has talked about a television being stolen, that noise is being heard that the officers didn't hear, and then various other matters about it. And then he manifests physically things that create alarm to her. She's got to act the way she did. This is not a total investigation for a lawsuit. This is a question of whether he should be committed under the local statute for an evaluation at the hospital. And this is part of the difficulty, we think, between an application for a TDO and a warrant. When she comes to a magistrate with this information, it's very persuasive. As she would pin it, very persuasive. The magistrate doesn't have the ability so much to independently verify this. That's why we think that there's more of a responsibility to investigate. If I understand your argument is that you have no problem with her acting on this. You just said she didn't have enough to act on. Is that what you're saying? I'm out of time. Yeah, you can answer. Ultimately, we think that for something as important as a temporary detention order, that she should have done more to investigate. And we would compare the cases of Kloninger and Robb where the mental health clinician in those cases did much more to investigate before issuing the TDO. Thank you, Your Honors. Thank you. Sure. All right, we'll come down and greet counsel and then go into our last case.
judges: William B. Traxler Jr., J. Harvie Wilkinson III, Paul V. Niemeyer